Wayne TURNER, et al., Plaintiffs,

v.

**DISTRICT OF COLUMBIA BOARD OF ELECTIONS AND ETHICS,** Defendant

and

United States of America, Intervenor.

No. CIV. A. 98–2634(RWR).

United States District Court, District of Columbia.

Sept. 17, 1999.

Arthur B. Spitzer, American Civil Liberties Union of National Capital Area, Washington, D.C., Graham Boyd, American Civil Liberties, Union Foundation, New Haven, CT, for Plaintiff.

Maria Amato, Chief, Civil Rights Division, Office of the Corporation Counsel, D.C., Washington, D.C., for Defendant.

Jeffrey S. Moskowitz, Civil Division, U.S. Department of Justice, Washington, D.C., for United States.

## *MEMORANDUM OPINION*

ROBERTS, District Judge.

Plaintiffs, five registered District of Columbia voters and a committee of such voters, and the defendant, the District of Columbia Board of Elections and Ethics ("the Board"), seek a declaratory judgment that § 171 of Congress's 1998 District of Columbia Appropriations Act (the "Barr Amendment") is unconstitutional if it bars the Board from counting, releasing, and certifying the results of the November 3, 1998 D.C. referendum known as Initiative 59. The United States intervened defending the constitutionality of the Barr Amendment, claiming that it bars certifying but not counting and announcing the election results. The Court held a consolidated hearing on the merits of plaintiffs' motion for a preliminary injunction and on the parties' cross motions for summary judgment. Because the Court holds that the Barr Amendment does not preclude the Board from counting, announcing or certifying the results of the referendum on Initiative 59, the Board may release and

certify them and the Court need not reach the constitutional question.

## Factual Background

On September 17, 1998, the Board certified a ballot initiative entitled Initiative 59 as proper for placement on the ballot for the November 1998 District of Columbia elections after the measure garnered the requisite support through signatures. (Def.'s Mem. Summ. J., Attmts. Ex. 2, Miller Decl. at 4 ("Miller Decl.").) Initiative 59, known as the Medical Marijuana Initiative, was designed, in part, to allow chronically ill individuals to use marijuana without violating criminal provisions of the D.C.Code. (Def.'s Mem. Supp. Summ. J. at 2–3 ("Def.'s Mem.").) Initiative 59 states in part:

> Sec. 1 All seriously ill individuals have the right to obtain and use marijuana for medical purposes when a licensed physician has found the use of marijuana to be medically necessary....
>
> Sec. 2 Medical patients who use, and their primary caregivers who obtain for such patients, marijuana for medical purposes upon the recommendation of a licensed physician do no[t] violate the District of Columbia Uniform Controlled Substances Act of 1981....

(Def.'s Mem., Attmts., Ex. 3.)

On October 21, 1998, Congress enacted the Barr Amendment as part of the District of Columbia Appropriations Act. Omnibus Consolidated Appropriations Bill of 1998, Pub.L. No. 105–277, 112 Stat. 2681–150 (1998). The Barr Amendment provides that:

> None of the funds contained in [the District of Columbia Appropriations Act] may be used to conduct any ballot initiative which seeks to legalize or otherwise reduce penalties associated with the possession, use, or distribution of any schedule I substance under the Con-

trolled Substances Act ... or any tetrahydrocannabinols derivative.

*Id.* Because Initiative 59 attempts to reduce penalties for some use and possession of marijuana, it falls under the purview of the Barr Amendment.

On November 3, 1998, residents of the District of Columbia voted on Initiative 59 since it had been printed on the ballots prior to passage of the Barr Amendment. (Def.'s Mem. at 8.) The Board has not released the results of the vote on Initiative 59, however, for fear of violating the Barr Amendment.

## I

### Interpreting the Barr Amendment

The text of the Barr Amendment prevents the Board from using funds to "conduct any ballot initiative" regarding any measure designed to lessen penalties for drug possession, use, or distribution. The question, then, is whether counting, releasing, and certifying the results of the election is part of conducting a ballot initiative.

The plaintiffs argue in their motion for summary judgment that the Amendment should apply to the activity that takes place only up to and including election day but not any of the duties required of the Board after election day. (Pls.' Mem. Supp. Summ. J. at 18 ("Pls.' Mem.").) This election, they argue, was conducted and concluded on November 3, 1998. According to the plaintiffs, the plain language of the Barr Amendment should not prevent release and certification of the election results because those activities are not part of the conduct of a ballot initiative. (*Id.*)

The United States agrees with this interpretation to a point.[1] It argues that the Barr Amendment does not prevent the

---

1. The parties in this case are oddly configured. The plaintiffs and the defendant are united in their argument that the Barr Amendment is unconstitutional while the intervenor argues in favor of the Amendment's

constitutionality. As is discussed below, the difference of opinion between the plaintiffs and the defendant seems to be their construction of the Barr Amendment and whether it allows the election results to be released.

Board from counting and releasing the election results in this case. (Tr. Motions Hr'g at 50; Intervenor's Mem. Supp. Summ. J. at 24 ("Int.'s Mem.").) The United States maintains that the Barr Amendment prohibits only certification of the results. (*Id.*) Certification would make the language of a winning initiative become law unless Congress disapproved it within 30 days. *See* D.C.Code Ann. §§ 1–233, 1–285 (1981). The United States draws this conclusion not from a plain reading of the amendment's text, but rather from the supposition that Congress did not want Initiative 59 to become law at all. (Tr. Motions Hr'g at 50; Int.'s Mem. at 2, 10, 15, 23.)

The lone litigant who has not addressed the meaning of "conduct any ballot initiative" is the Board. However, in its motion for summary judgment and attachments, the Board describes what is required in order for it to count, release, and certify the result of last fall's election. To count and release the result of the election on Initiative 59, a member of the Board, or its staff, would have to request the count from the computer on those ballots that were tabulated by computer. (Miller Decl. at 7.) The expenditure would be "minimal." (*Id.* at 8.) The Board may also have to hand count some votes, which also involves minimal expenditure. (Def.'s Stmt. of Material Facts Not in Genuine Dispute at 5.) To certify the vote, the Board would have to convene a meeting at which the result of the election would be recorded on a certification form and adopted by the Board. (Miller Decl. at 8.) The costs of these actions would also be minimal. (*Id.*) Certification is mainly a ministerial task which would take no longer than five minutes. (*Id.*) Based on this recitation, and the fact that the Board has not taken those actions, it seems apparent that the Board views any expenditure on Initiative 59—whether before, during or after the election—as violating the Barr Amendment.

The Barr Amendment itself provides no guidance on exactly what "conduct any ballot initiative" is meant to entail. The sparse legislative history offers scant clarification. 144 Cong. Rec. H7388–89 (daily ed. Aug. 6, 1998). The plaintiffs' argument that the Board's activities after election day are excluded finds support, however, in the D.C.Code section describing the Board of Elections' responsibilities in D.C. elections. The D.C.Code directs the Board to, among other things, "(3) Conduct elections; (4) Provide for recording and counting votes by means of ballots or machines or both; [and] ... (11) Certify ... the results of elections." D.C.Code Ann. § 1–1306 (1981). By listing these tasks separately, the D.C.Code implies that each is a distinct responsibility, and that conducting an election does not encompass counting or certifying the vote.

A plain language reading of the Barr Amendment does little to undercut the plaintiffs' position. It also offers little support for the position that the Barr Amendment prevents certifying the results of this election but not counting or releasing the results, as the United States argues. There are two possible constructions of the phrase "conduct any ballot initiative" in this context. It could entail the entire process of the election, from the moment an initiative is proposed for the ballot until the results are certified to Congress. Alternatively, it could mean merely managing election activity on the day of the election. There is no reason to distinguish between counting, release and certification when defining this phrase. All of these tasks are ministerial. All involve minimal expenditure. All occur after the voting is over.

 Courts must accord acts of Congress the presumption of constitutionality. *See e.g., Rust v. Sullivan,* 500 U.S. 173, 190–91, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). Where at all possible, courts are required to construe Congressional legislation in a way that avoids constitutional infirmities. *Id.* The original parties in this case argue that if the Barr Amendment prohibits counting, releasing and certifying

these election results, then it violates the constitutional rights of freedom of expression and equal protection. With "conduct any ballot initiative" interpreted as referring only to conducting election day affairs, the Board would be allowed to count, release and certify the vote on Initiative 59. The constitutional claims would not be reached. Because a plain reading of the amendment supports this interpretation, and because the opposite interpretation is constitutionally infirm for the reasons discussed below, the Court holds that the phrase "conduct any ballot initiative" in the Barr Amendment does not prevent the District of Columbia Board of Elections and Ethics from counting, releasing and certifying the vote on Initiative 59 taken on November 3, 1998.[2]

## II

### Congress's Power over the District of Columbia

■ Constitutional issues would be implicated if the Barr Amendment precluded the Board from announcing and certifying the election results. One question, though, is whether Congress's unique relationship to the District creates a different analytical context in which to consider the alleged burden on First Amendment rights. It may be that because Congress has the power to withdraw the ballot initiative process from D.C. voters in its entirety, Congress could therefore take the lesser step of withdrawing particular kinds of ballot initiatives from D.C. voters.

That is not the question to be decided in this case, however. The issue here is not whether the Barr Amendment is constitutional as applied to a proposed initiative that was kept off the ballot. In this case, D.C. voters were properly given the opportunity to vote on a ballot initiative and did so. The issue here is whether Congress's plenary power over the District of Colum-

bia encompasses the power to prevent political speech, in the form of the results of votes properly cast in a properly conducted ballot referendum, from being made public. The answer to that question must be no.

Congress's power over the District is granted by the Constitution and is very broad. Congress may "exercise exclusive Legislation in all Cases whatsoever, over such District ... as may ... become the Seat of the Government of the United States." U.S. Const. art. I § 8 (the "D.C. Clause"). That clause has been interpreted to grant plenary power to Congress over the District of Columbia. *See Palmore v. United States*, 411 U.S. 389, 397, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973). Congress acts as a local legislative body for D.C. *Id.* Home Rule and other subsequent legislation have allowed District residents some measure of governmental power. *See* D.C.Code Ann. §§ 1–201 to 299 (1981). Even after the passage of Home Rule, however, Congress retains broad authority to pass local laws on any subject. *See* D.C.Code Ann. § 1–206 (1981). Thus, this Court is mindful of Congress's broad legislative powers over the District, as granted by the D.C. Clause.

The D.C. Clause may not be read in isolation from the rest of the Constitution, however, any more than any other constitutional clause may be read alone. In this area, as in all others, Congress's actions are constrained by the Constitution itself, as the Supreme Court has explained. *See Palmore*, 411 U.S. at 397, 93 S.Ct. 1670 ("Congress 'may exercise within the District all legislative powers that the legislature of a state might exercise within the State ... *so long as it does not contravene any provision of the constitution of the United States*'" (quoting *Capital Traction v. Hof*, 174 U.S. 1, 5, 19 S.Ct. 580, 43 L.Ed. 873 (1899))) (emphasis added); *cf. Grant*

---

**2.** This conclusion does not necessarily render the Barr Amendment meaningless. For example, from the day the amendment was enacted up through the election day, the

amendment precluded other initiative-related expenditures such as "publicity surrounding that ballot." 144 Cong. Rec. H7389 (daily ed. Aug. 6, 1998) (statement of Rep. Barr).

*v. Meyer,* 828 F.2d 1446, 1456 (10th Cir.1987)(having granted citizens the right to an initiative procedure, the State was obligated to confer the right in a manner consistent with the Constitution), *aff'd,* 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988).

It is no surprise that Congress is so limited. In other areas where the Constitution grants Congress virtually total control over legislation, the Constitution always prescribes the boundaries of its abilities. *See New York v. United States,* 505 U.S. 144, 166, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (finding limits upon the kind of legislation that Congress constitutionally may pass under the Commerce Clause); *accord Printz v. United States,* 521 U.S. 898, 923–24, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (finding the Commerce Clause in combination with the Necessary and Proper Clause as insufficient sources of power for Congress to force local law enforcement agencies to take part in federal laws on background checks for gun sales). The Supreme Court has also found, similarly, that the power to regulate federal elections was modified by Congress's responsibility not to interfere with First Amendment rights. *See Buckley v. Valeo,* 424 U.S. 1, 13–20, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Indeed, the very idea of judicial review is premised on the idea that the courts exist, in part, in order to ensure that Congress does not overstep the lines described by the Constitution. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 180, 2 L.Ed. 60 (1803) (stating that "a law repugnant to the constitution is void").

Congress's acts controlling the District are no exception to that fundamental rule. *See Palmore,* 411 U.S. at 397, 93 S.Ct. 1670. Congress's laws for the District must pass constitutional muster as much as any other Congressional enactment must. Congress's power over the District therefore does not exempt the Barr Amendment from First Amendment review.

### The First Amendment

The Barr Amendment purports to restrict activity that involves voting by D.C. citizens. The vote has long been considered the crux of the democratic system. *See Williams v. Rhodes,* 393 U.S. 23, 31, 89 S.Ct. 5, 21 L.Ed.2d 24, (1968) (describing the right to vote as among the "more precious in a free country" (quoting *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964))). The right to speak to our governing bodies, through the vote, ensures our nation's ability to function as a democracy, with legislatures responsive to their voting constituents. *See id.* (" 'Other rights, even the most basic, are illusory if the right to vote is undermined' "); *see also Illinois State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) (stating that "voting is of the most fundamental significance under our constitutional structure").

The right to vote has been most powerfully raised in Equal Protection claims where burdened parties sought relief from the inability to cast their votes "effectively." *See Socialist Workers,* 440 U.S. at 184, 99 S.Ct. 983. When the right to vote is raised in the context of the First Amendment, it gives rise to layered standards of review. *See Burdick v. Takushi,* 504 U.S. 428, 433–34, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (stating that "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights"). Debates about the standard of review, however, only reinforce the idea that the results of votes properly cast in a properly conducted ballot referendum are due some level of First Amendment protection.

Symbolic speech is accorded constitutional protection. The First Amendment shields a symbolic act if it has sufficient communicative power such that it " 'in-

ten[ds] to convey a particularized message ... and ... the likelihood was great that the message would be understood.'" *See Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (quoting *Spence v. Washington,* 418 U.S. 405, 410–11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974)). This principle has protected a variety of acts. *See Texas v. Johnson,* 491 U.S. at 406, 109 S.Ct. 2533 (holding that burning a flag is protected by the First Amendment); *Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 514, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (holding that wearing black armbands to protest the war in Vietnam was protected under the First Amendment).

■ When a citizen steps into the voting booth to cast a vote on a matter properly on the ballot, he or she intends to send a message in support of or in opposition to the candidate or ballot measure at issue. *See Socialist Workers Party,* 440 U.S. at 184, 99 S.Ct. 983 (describing limits on ballot access as "impair[ing] the voter's ability to *express their political preferences*") (emphasis added). The message of the vote is received when the election results are released thereby completing an important communication by the public to the government. Through election voting, the public affects public governance by determining who holds office or which referenda properly before the voters will or will not become law. *See Burdick,* 504 U.S. at 438, 112 S.Ct. 2059 (stating that "the function of the electoral process is to 'winnow out and finally reject all but the chosen candidates'") (citation committed).[3] Because voters in properly conducted elections intend to send a particularized message which is received by those who act on the results of the elections, voting results can be categorized as protected symbolic speech under the *Texas v. Johnson* test.

Core political speech is also constitutionally shielded. It is accorded "the broadest protection" under the First Amendment. *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 346, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). Unfortunately, not every variety of "core political speech" has been clearly catalogued. It has involved mostly pre-election activity and speech. *See, e.g., id.* at 347, 115 S.Ct. 1511 (finding that handing out anonymous leaflets about an upcoming election is core political speech); *Meyer v. Grant,* 486 U.S. 414, 425, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) (finding that circulation of an initiative petition involves core political speech). The phrase usually has been used to encompass speech about political candidates or ideas, *see id.,* but not necessarily the vote itself.

The reasons for protecting core political speech shed some light on the nature of what that term should entail. Core political speech is given the broadest protection

---

3. The *Burdick* Court added that the purpose of an election is "not to provide a means of giving vent to 'short-range political goals, pique, or personal quarrels.' Attributing to elections a more generalized expressive function would undermine the ability of States to operate elections fairly and efficiently." *Burdick,* 504 U.S. at 438, 112 S.Ct. 2059 (internal citation omitted). This quote does not undermine the fact that voting is speech in this case.

In *Burdick* the issue was what level of protection should be granted to voters' desire to cast a protest vote by writing in the names of candidates not listed on the ballot and to have those votes counted. *Id.* at 430, 112 S.Ct. 2059. The Supreme Court held that a state need not allow voters the opportunity to express their opinions on every possible candidate or subject in any given election where candidates' ballot access and voters' rights to cast a vote were otherwise provided for adequately. *Id.* at 438, 112 S.Ct. 2059. States were therefore not required to count write-in votes. *Id.*

The issue in this case is the level of protection to be granted to votes lawfully cast on an issue properly placed before the voting public. *Burdick* held that there was not a sufficient First Amendment interest in voting for write-in candidates to outweigh the state's interest in efficient elections. *Id.* at 440, 112 S.Ct. 2059. The matter before this Court concerns the First Amendment rights of citizens of the District of Columbia to have made known the results of their votes properly cast on an issue properly placed on the ballot.

in order " 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' " *McIntyre,* 514 U.S. at 346, 115 S.Ct. 1511 (quoting *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)). If discussion about social and political change is core political speech, it follows that the instrumentality used to bring about political and social change, that is, a lawful vote and its results, should be given the same kind of protection.

The United States has not argued to this Court that voting results are not speech. Rather, the government suggests avoiding the First Amendment question altogether. The United States' position is that the Barr Amendment does not prevent release of the election result but that certification of the result is not protected by the First Amendment. (Tr. of Mot. Hr'g at 51.) Calling Congress's action through the Barr Amendment "prospective repeal," the government argues that the Barr Amendment has the same effect as a law stating that marijuana is illegal in the District of Columbia. No First Amendment rights are implicated, the government argues, because the Barr Amendment has the same effect as such a law.

█ There is no doubt that Congress could pass such a law that would have full force in the District. As described above, Congress is fully empowered to enact substantive local laws for the District. That fact, however, does not change the nature of a vote tally on a matter properly placed on a ballot. Speech does not change its character for having taken place in the District of Columbia. *Cf. Boos v. Barry,* 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (discussing restrictions on picketing in the District and finding that Congress's power over the District did not change the analysis of First Amendment rights in that case). Congress's power over the District cannot change the fundamental nature and meaning of the acts of lawful voting and communicating voting results. *Cf. Buckley,* 424 U.S. at 13–14, 96

S.Ct. 612 (stating that "the critical constitutional questions presented here go not to the basic power of Congress to legislate in this area, but to whether the specific legislation that Congress has enacted interferes with First Amendment freedoms"). The legal status of the vote remains constant. Congress did not choose to pass a law only about drug possession, use, and distribution. It chose to pass a law about elections. Based on the vote's strong communicative content and the history of the vote's central importance to a democratic system of government, this Court concludes that the results of votes properly cast in a properly conducted election are core political speech.

If the Barr Amendment precluded release and certification of the results of the referendum, it would have to pass constitutional muster. The proper level of review would be strict scrutiny for at least three reasons. First, as discussed above, denying D.C. citizens access to the outcome of the election held on November 3, 1998 burdens core political speech. The Supreme Court instructs that "[w]hen a law burdens core political speech, we apply 'exacting scrutiny' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest." *McIntyre,* 514 U.S. at 347, 115 S.Ct. 1511 (citing *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 786, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)).

Second, the amendment would be a content-based restriction on speech. Content-based restrictions are those that restrict speech "based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 828, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). The Barr Amendment language purports to prevent the Board from conducting ballot initiatives on reducing penalties for certain drug possession. Congress may have entirely understandable motives for attempting to curb drug possession, use, and distribution in the District. That does not change the fact that keeping a

veil over the results of a properly conducted referendum would cut short public expression about the topic of drug legalization—either pro, con or neutral. As a content-based restriction, the Barr Amendment would be subject to strict scrutiny. *See Buckley v. American Constitutional Law Found.,* 525 U.S. 182, 119 S.Ct. 636, 651, 142 L.Ed.2d 599 (1999) (Thomas, J, concurring).

*Burdick* instructs yet a third way to characterize this issue while still arriving at the same end:

> [T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance."

*Burdick,* 504 U.S. at 434, 112 S.Ct. 2059 (quoting *Norman v. Reed,* 502 U.S. 279, 289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992)).[4]

In this case, First Amendment speech through the vote would have been effectively extinguished if the Barr Amendment had blocked releasing and certifying the results. To cast a lawful vote only to be told that that vote will not be counted or released is to rob the vote of any communicative meaning whatsoever. Speaking within the context of a congressional election, the Supreme Court specifically stated that "[o]bviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots *and have them counted.*" *United States v. Classic,* 313 U.S. 299, 315, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941) (emphasis added). If the Barr

Amendment were to keep the votes on Initiative 59 from being released and certified, the vote would be a muzzled expression and a meaningless right. Such a restriction on the vote would be severe and would appropriately trigger strict scrutiny.

Congress's interest in preventing legalization of marijuana presumably would be the compelling government interest in this case. (Int.'s Mem. at 10.) The United States chose not to brief the issue of the proper standard of review or its application, however, believing no First Amendment analysis was necessary. (*Id.* at 25.)

Assuming that prevention of marijuana's legalization is a compelling state interest, blocking the release and certification of the results of votes properly cast in a properly conducted ballot referendum would not appear to be a narrowly tailored measure to achieve that interest. As all sides admit, Congress is empowered to disapprove Initiative 59, if it passes, during a review period after the election or to defeat it by repeal. *See* D.C.Code Ann. §§ 1–206, 1–233 (1981). If Congress's interest here is to assure that drug possession, use, and distribution are not legalized in the District, that interest readily can be met without burdening First Amendment rights.

The United States argues that the Barr Amendment is a "prospective repeal." (Int.'s Mem. at 15.) The government contends that because Congress could have passed a local law criminalizing drug possession, it could instead pass the Barr Amendment to prevent the conduct of a ballot initiative on that same topic. (*Id.*) Presumably, under that reasoning, Congress could enact a law that precluded the release and certification of the results of lawfully cast votes on matters properly placed on a D.C. ballot.

Just because one end can be accomplished constitutionally does not suggest

---

4. *Burdick* applied a lesser standard to the law in that case because the matter involved facially neutral election laws propounded in the name of efficiency. *See Burdick,* 504 U.S. at 438, 112 S.Ct. 2059. The state's asserted interest in that case was in conducting elections uncluttered by extraneous, write-in votes for candidates. *Id.* There is no such asserted interest in this case. As described below, the asserted state interest is in preventing drug legalization.

that any means possible to accomplish the desired end is constitutional. In *Clinton v. City of New York*, 524 U.S. 417, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998), Congress argued that the line item veto must be constitutional because the President could accomplish the same ends without the benefit of the line item veto. *See id.* at 2105 (quoting the government's argument that "the substance of the authority to cancel tax and spending items 'is, in practical effect, no more and no less than the power to "decline to spend" specified sums of money, or to "decline to implement 'specified tax measures' "). That law, however, was held to be unconstitutional because it was deemed an unconstitutional *means* of vetoing legislation. *See id.* at 2108. Similarly, in *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), the fact that Congress, by bicameral enactment signed by the President, could amend or repeal a statute in order to alter the way the Executive Branch enforced it, did not justify a one-house veto of executive actions. *See Chadha*, 462 U.S. at 954, 958–59, 103 S.Ct. 2764 (finding that although the constitutional structure for passing laws is cumbersome and difficult, Congress is bound by it).

In this case, simply because Congress could prevent Initiative 59 from becoming law another way does not mean that it could do so in any manner. Passing a local law to apply in the District that outlaws marijuana possession, use, and distribution is perfectly permissible. *See*

D.C.Code Ann. § 1–206. An enactment that precluded the Board from releasing and certifying the results of a proper election achieves the same result but infringes on D.C. citizens' First Amendment rights. That would be not permissible. Indeed, Congress's ability to achieve its purpose another way would tend to show that the law would not be not narrowly tailored enough to meet the asserted compelling state interest.

Under our Constitutional structure, the way government accomplishes it purposes matters. *See Chadha*, 462 U.S. at 958–59, 103 S.Ct. 2764. In legislating for the District, Congress is as bound by the Constitution as it is when it legislates for the country as a whole. In this case, the principle of prospective repeal to justify not releasing and certifying the results of the Initiative 59 referendum would not comport with the First Amendment rights and the narrow tailoring requirement imposed by the Bill of Rights and the Supreme Court.[5]

In summary, if the Barr Amendment precluded counting, releasing, and certifying the results of votes properly cast in a proper referendum, it would burden core political speech and would not be sufficiently narrowly tailored to meet the government's interest in criminalizing drug possession or use. It would not survive strict scrutiny.[6]

### Conclusion

The Barr Amendment precluded use of funds appropriated for the District of Co-

---

5. The United States argues that the First Amendment does not prevent restrictions against plainly improper or unconstitutional initiatives being placed on referendum ballots. (Int.'s Mem. at 18–20.) Initiative 59 is neither. The government cites no D.C.Code provision that precludes ballot initiatives on reducing local penalties for possession of marijuana. It does not argue that the Board was wrong in approving the proposed initiative as a proper subject or in certifying Initiative 59 to the ballot. (Miller Decl. at 4.) In addition, whatever else Initiative 59 purports to do, it proposes making local penalties for drug possession narrower that the comparable federal ones. Nothing in the Constitution prohibits such an action.

6. The amended complaint alleges that the Barr Amendment denied plaintiffs due process of law and the equal protection of the laws in violation of the Fifth Amendment to the Constitution. The Board moved for summary judgment on the equal protection claim, agreeing with the plaintiffs' amended complaint. Neither the plaintiffs nor the United States address the Fifth Amendment claims in their motions for summary judgment. Because the Court has interpreted the Barr Amendment as not prohibiting the Board from counting, releasing and certifying the results of the votes on Initiative 59, the Fifth Amendment claims need not be reached.

lumbia in 1998 to conduct election day activities related to Initiative 59. It did not preclude counting, announcing and certifying the results of the vote on Initiative 59 thereafter. If it had precluded handling the results, it would have violated plaintiffs' First Amendment rights. However, the court does not decide the constitutional issues since this interpretation of the statute avoids the need to reach them.

There are no genuine issues of material fact concerning plaintiffs' motion for summary judgment [11] on count two of the original complaint, insofar as it argues that the Barr Amendment does not prevent the Board from computing and certifying the results of the referendum on Initiative 59. That portion of plaintiffs' motion will be GRANTED. The remainder of plaintiffs' motion will be DENIED. The defendant's motion [2] for an order authorizing it to announce and certify the results of the vote on Initiative 59 in accordance with D.C.Code § 1–285 (1981) will be GRANTED. The defendant's motions for a declaratory judgment that the Barr Amendment violates the first amendment [2] and for summary judgment [13] will be DENIED. The United States' motion for summary judgment [12] will be DENIED. An appropriate order accompanies this memorandum opinion.