**MARIJUANA POLICY PROJECT,**
**et al., Plaintiffs,**

v.

**DISTRICT OF COLUMBIA BOARD**
**OF ELECTIONS AND ETHICS,**
**et al., Defendants.**

**No. Civ.A. 01–2595(EGS).**

United States District Court,
District of Columbia.

March 28, 2002.

198

Alexei Michael Silverman, Gregg H. Levy, Covington & Burling, Washington, DC.

Kenneth Joseph McGhie, District of Columbia Board of Election and Ethics, Washington, DC.

Amy Allen Ruggeri, United States Department of Justice, Washington, DC.

## MEMORANDUM OPINION

SULLIVAN, District Judge.

Plaintiffs in this matter are proponents of a ballot initiative entitled the Medical Marijuana Initiative of 2002 ("Initiative"). The District of Columbia Board of Elections and Ethics ("Board") has refused to certify plaintiffs' proposed ballot initiative because the Board is of the opinion that to do so would violate the Barr Amendment, Pub.L. 107–96, § 127, 115 Stat. 923 (2001). Plaintiffs claim that the Barr Amendment, which prohibits the District of Columbia from expending any monies to enact a law that would decrease the penalties for use or distribution of a Schedule I controlled substance, is unconstitutional as applied to their ballot initiative. They commence this action against the Board and the United States [1] and seek injunctive relief.

The Constitution of the United States mandates that the United States Congress shall act as the legislature for the District of Columbia. U.S. Const., Art. I, § 8, cl. 17. Acting in its legislative capacity, Congress, with the approval of the President, has enacted a Home Rule Act that gives the District's citizens some measure of democratic governance. District of Columbia Self–Government and Governmental Reorganization Act ("Home Rule Act"), Pub.L. No. 93–198, 87 Stat. 774 (1973), codified at D.C.Code § 1–201.01 et seq. (as amended). Consequently, although District citizens do not have the right to vote in Congressional elections, Adams v. Clinton, 90 F.Supp.2d 35, 70 (D.D.C.2000), aff'd, 531 U.S. 941, 121 S.Ct. 336, 148 L.Ed.2d 270 (2000), they are able to vote for a non-voting delegate to the House of Representatives, for D.C. City Council members, and for initiatives placed on the ballot by the citizenry.

---

1. Plaintiffs initially sued Paul O'Neill as Secretary of Treasury; on January 16, 2002, the Court granted a consent motion to substitute the United States for O'Neill.

When Congress enacted the Barr Amendment, which constitutes the subject of this lawsuit, it prohibited the District from using any federally appropriated funds to permit the citizens to vote on a ballot initiative that would decrease penalties associated with a Schedule I controlled substance. In short, Congress removed a specific viewpoint from the realm of permissible initiatives on which District citizens may vote to enact legislation.

While Congress has a unique relationship to the District, it is duty-bound to legislate within the limits of the Constitution. The Constitution does not allow Congress to preclear acceptable viewpoints for public debate and expression:

> [T]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments. They may consider, in making their judgment, the source and credibility of the advocate. But if there be any danger that the people cannot evaluate the information and arguments advanced ..., it is a danger contemplated by the Framers of the First Amendment.

*First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 791–92, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978).

Constitutional precedent of long-standing persuades the Court that the Barr Amendment is a viewpoint discriminatory restriction on plaintiffs' political speech and is consequently unconstitutional. Upon careful consideration of the motions for summary judgment, the responses and replies thereto, oral argument by counsel on February 25, 2002, and the relevant statutory and case law, the Court grants plaintiffs' motion for summary judgment and denies defendant's motion for summary judgment. The enforcement of the Barr Amendment with respect to the plaintiffs and their proposed ballot initiative is permanently enjoined.

# I. BACKGROUND

Plaintiffs seek Board approval of a proposed ballot initiative, Medical Marijuana Initiative of 2002, so that they may gather signatures to support the inclusion of the initiative on the ballot at the next general election. Plaintiffs' efforts to promote the Medical Marijuana Initiative implicate issues concerning federal controlled substance law, the District of Columbia's Home Rule Act and the relationship between Congress and the District of Columbia.

## A. The Barr Amendment

In the 1998 general election, District of Columbia voters cast ballots for an initiative similar to the one at issue here. The initiative was entitled Medical Marijuana Initiative of 1998 ("Initiative 59") and would have permitted chronically ill individuals to use marijuana without violating the D.C.Code. On September 17, 1998, the Board certified Initiative 59 as a proper subject for the November 3, 1998 election ballot.

Congress responded to the Board's approval of the ballot initiative by enacting what has come to be known as the Barr Amendment, named after its sponsor, Representative Bob Barr. On October 21, 1998, Congress enacted the initial version of the Amendment as part of the District of Columbia Appropriations Act, 1999, Pub.L. No. 105–277, § 171, 112 Stat. 2681 (1998). As originally enacted, the Amendment provided:

> None of the funds contained in [the District of Columbia Appropriations Act] may be used to conduct any ballot initiative which seeks to legalize or otherwise reduce the penalties associated with the possession, use or distribution of any schedule I substance under the Con-

trolled Substances Act ... or any tetra-hydrocannabinols derivative.

*Id.*

The Board permitted D.C. residents to vote on Initiative 59 because the ballots had been printed prior to the enactment of the Barr Amendment. However, the Board refused to release the election results, fearing that to do so would violate the Barr Amendment.

In *Turner v. District of Columbia Board of Elections & Ethics,* plaintiffs sought a declaration that the Barr Amendment as applied to Initiative 59 was unconstitutional. 77 F.Supp.2d 25, 26 (D.D.C.1999) (Roberts, J.). The United States intervened to assert the constitutionality of the amendment. *Id.* Relying on the plain meaning of the statute, the court avoided the constitutional question, and ruled as a matter of statutory interpretation that the Barr Amendment did not preclude the Board from counting, announcing or certifying the results of that election. *Id.* at 26–28. Nevertheless, the court expressed serious doubts that the amendment would survive constitutional scrutiny if it were construed to prevent the certification of vote results. *Id.* at 28–34. Accordingly, the *Turner* court ordered the Board to announce the results of Initiative 59, which disclosed that 69 percent of District voters had supported the ballot initiative.

While the *Turner* litigation was pending, Representative Bob Barr introduced a revised version of his amendment to be included in the District of Columbia Appropriations Act for the 2000 fiscal year. The revised version was voted out of committee on July 22, 1999, *see* H.R.Rep. No. 106–249, at 94 (1999), and was the subject of a debate on the House floor a week later, *see* 145 Cong.Rec. H6638–42 (July 29, 1999). President Clinton vetoed the original version of the D.C. Appropriations Act for fiscal year 2000, in part due to the inclusion of the revised Barr Amendment. 145

Cong.Rec. H8941–42, H.Doc. No. 106–153 (September 28, 1999) (veto message of Pres. Clinton). The D.C. Appropriations Act was returned to the House, where there was once again debate on the House floor with respect to the scope and purpose of the Barr Amendment. *See, e.g.,* 145 Cong.Rec. H10086 (October 14, 1999) (Rep. Barr stated "We sure as heck are not going to make it legal to do drugs in the District of Columbia. That, Mr. Speaker, is precisely what the District of Columbia wants to do.").

A revised version of the Barr Amendment was included in the final District appropriations law for fiscal year 2000. As enacted, it stated:

> (a) None of the funds contained in this Act may be used to *enact or carry out* any law, rule, or regulation to legalize or otherwise reduce penalties associated with the possession, use, or distribution of any schedule I substance under the Controlled Substances Act ... or any tetrahydrocannabinols derivative.
>
> (b) The Legalization of Marijuana for Medical Treatment Initiative of 1998, also known as Initiative 59, approved by the electors of the District of Columbia on November 3, 1998, shall not take effect.

Pub.L. 106–113, § 167, 113 Stat. 1530 (1999) (emphasis added). Identical language was included in both the District of Columbia Appropriations Act for fiscal year 2001, *see* Pub.L. 106–522, § 143, 114 Stat. 2471 (2000), and fiscal year 2002, *see* Pub.L. 107–96, § 127, 115 Stat. 923 (2001). The Barr Amendment for fiscal year 2002 is presently in effect.

**B. Procedural History**

On July 25, 2001, the Marijuana Policy Project filed forms with the District of Columbia Board of Elections and Ethics

("Board") in order to commence a ballot initiative entitled "Medical Marijuana Initiative of 2002." The proposed initiative would amend District of Columbia law to allow individuals suffering from "debilitating medical conditions" to obtain and use marijuana for medical purposes if they have the "approval" of a licensed physician and adhere to the "limitations and safeguards" "established by the measure." Under the proposed initiative, doctors could not be punished pursuant to District of Columbia law for recommending the use of marijuana for medical purposes. Medical patients and their primary caregivers would similarly be excluded from the enforcement of District laws punishing the use of marijuana if they obtained marijuana for medical purposes upon the recommendation of a doctor. The proposed initiative does not purport to modify existing federal criminal law governing controlled substances.

The processing of Medical Marijuana Initiative of 2002 would require the Board to use funds contained in the D.C. Appropriations Act to enact or carry out any law to legalize or otherwise reduce penalties associated with the possession, use, or distribution of marijuana, a Schedule I substance under the Controlled Substances Act. On December 14, 2001, the Board issued a memorandum opinion stating that to process plaintiffs' initiative for placement on the ballot would constitute a violation of the Barr Amendment because it would necessarily expend federally appropriated funds in reviewing the initiative. Consequently, the Board refused to process the initiative.

On December 18, 2001, plaintiffs filed the instant lawsuit. On January 3, 2002, they moved for a temporary restraining order and preliminary injunction. Following a status hearing on January 8, 2002 and pursuant to Fed.R.Civ.P: 65(a)(2), the Court consolidated plaintiffs' motion for a temporary restraining order and for injunctive relief with the merits proceeding. Plaintiffs and defendant United States filed cross-motions for summary judgment. The Board filed a short explanatory memorandum outlining the procedures for reviewing a ballot initiative and placing it on the ballot.

## C. The Controlled Substances Act

Plaintiffs' initiative would modify penalties for marijuana use, possession and distribution set out in the D.C.Code. Current District of Columbia criminal law prohibits the possession and distribution of marijuana. *See* D.C.Code § 48–901.02, *et seq.* However, federal law also regulates the use, possession and distribution of marijuana in the District of Columbia.

The Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, establishes a comprehensive federal regulatory scheme that places drugs into one of five "Schedules." Marijuana is classified as a Schedule I substance, which means that Congress found that it has a "high potential for abuse," that it has "no currently accepted medical use in treatment in the United States," and that there is a "lack of accepted safety for use of the drug or other substance under medical supervision." 21 U.S.C. § 812(b)(1). As a result of these findings, Congress mandated that marijuana and other substances in Schedule I be subject to the most stringent regulation. In particular, no physician may dispense marijuana to any patient outside of a strictly controlled research project. *See* 21 U.S.C. § 823(g); *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 492, 121 S.Ct. 1711, 1718, 149 L.Ed.2d 722 (2001); *accord Alliance For Cannabis Therapeutics v. Drug Enforcement Administration*, 15 F.3d 1131, 1137 (D.C.Cir. 1994) (holding that DEA decision not to

reclassify marijuana from Schedule I to Schedule II was not arbitrary).

### D. Home Rule

While plaintiffs and the United States disagree as to the significance of the District of Columbia's limited self-government for the instant matter, it is clearly a factor in the Court's analysis.

The United States Constitution expressly grants Congress the power to "exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square), as may, by Cession of particular States, and the Acceptances of Congress, become the Seat of Government of the United States." U.S. Const., Art. I, § 8, cl. 17.

In 1973, Congress provided the District with a limited form of self-government, or "home rule." See Home Rule Act, codified at D.C.Code § 1–201.01 et seq. (as amended). Title IV of the Home Rule Act creates a tripartite form of government for the District, with a popularly elected Council and Mayor and a judicial system established by Congress. See Hessey v. District of Columbia Bd. of Elects. & Ethics, 601 A.2d 3, 14 (D.C.1991) (en banc). The Home Rule Act reserves to Congress the "right, at any time, to exercise its constitutional authority as legislature for the District on any subject ... including legislation to amend or repeal any law in force in the District prior to or after enactment of this chapter and any act passed by the Council." D.C.Code § 1–206.01. The Home Rule Act provides that the District of Columbia government may expend monies only to the extent that such expenditures are provided for by an Act of Congress. § 1–204.46.

The D.C. Council has authority over "all rightful subjects of legislation." § 1–203.02. This authority is subject to limitations mandated by Congress. For example, the D.C. Council may not enact legislation with respect to the local judiciary, § 1–206.02(a)(4), with respect to the Commission on Mental Health, § 1–206.02(a)(7), or impose income taxes on individuals not residing in the District, § 1–206.02(a)(5). Before measures approved by the Council can have the force of law, they must be transmitted to Congress for its consideration. § 1–206.02(c)(1). Only if Congress does not pass a joint resolution disapproving of the measure within 30 days does it take effect. Id.

In 1978, the Home Rule Act was amended to grant District residents the right to enact laws directly through the ballot initiative process. See Initiative, Referendum and Recall Charter Amendments Act of 1977, D.C.Law 2–46, codified at D.C.Code § 1–204 et seq. A ballot initiative is defined as "the process by which the electors of the District of Columbia may propose laws (except laws appropriating funds) and present such proposed laws directly" to the voters. § 1–204.101(a).

■■■ The District of Columbia Board of Elections and Ethics ("Board") is an independent agency responsible for overseeing the ballot initiative process. The Board ensures that any proposed initiative is a "proper subject" for a ballot initiative. § 1–1001.16(b). A "proper subject" for an initiative is one that does not conflict with title IV of the Home Rule Act, Hessey v. District of Columbia Bd. of Elecs. & Ethics, 601 A.2d 3, 14 (D.C.1991) (en banc); does not propose a law appropriating funds; § 1–1001.16(b)(1)(D); and does not violate the District's anti-discrimination statute, § 1–1001.16(b)(1)(C). The Board may also keep a measure off the ballot if it would be patently unconstitutional if enacted. See Comm. for Voluntary Prayer v. Wimberly, 704 A.2d 1199 (D.C.1997).

If the Board determines that a proposed measure is a "proper subject" and if the

measure garners a sufficient number of petition signatures, the Board is required to conduct an election on the initiative at the next primary, general, or city-wide election. *See* § 1–1001.16(p)(1). If a measure is approved by a majority of the qualified District residents voting on a ballot initiative, it becomes an "act of the Council upon the certification of the vote on such initiative or act by the Board of Election and Ethics." § 1–204.105. As with other acts of the Council, a measure adopted by ballot initiative only has the force of law if Congress does not pass a joint resolution disapproving it within 30 days of its transmission to Congress. §§ 1–204.105, 1–206.02(c), 1–1001.16(r)(1). This joint resolution must be signed by the President.

The District of Columbia Court of Appeals has held that District voters' authority to adopt initiatives is generally coextensive with the Council's authority to pass legislation. *See Atchison v. Dist. of Columbia*, 585 A.2d 150, 156 (D.C.1991); *Convention Ctr. Referendum Comm. v. District of Columbia Bd. of Elecs. & Ethics*, 441 A.2d 889, 897 (D.C.1981) (en banc).

## II. DISCUSSION

### A. Standard of Review

Summary judgment should be granted pursuant to Fed.R.Civ.P. 56 only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879 (D.C.Cir.), *reh'g en banc granted*, 124 F.3d 1302 (1997). In ruling upon cross-motions for summary judgment, the Court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *See Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir.1975).

All parties to this action concur that there are no genuine issues of material dispute facing the Court. Summary judgment is particularly appropriate where, as here, a case presents a "pure question of law" that is ripe for decision. *See Wyoming Outdoor Council v. Dombeck*, 148 F.Supp.2d 1, 7 (D.D.C.2001); *see also Swan v. Clinton*, 100 F.3d 973, 976 (D.C.Cir.1996).

■ Courts must accord acts of Congress the presumption of constitutionality. *Rust v. Sullivan*, 500 U.S. 173, 190–91, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). The Court takes seriously the invalidation of a Congressional action on constitutional grounds, and will apply the "cardinal principle" of avoiding such a determination where it is possible to decide the case on other grounds. *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 2498, 150 L.Ed.2d 653 (2001); *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). Thus, the Court first considers the United States' argument that the Barr Amendment is an exercise of Congress' plenary legislative authority and consequently implicates no First Amendment concerns.

Plaintiffs bear the burden of demonstrating to the Court that the Barr Amendment implicates First Amendment interests. As the Supreme Court has explained:

Although it is common to place the burden upon the Government to justify impingements on First Amendment interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive. In the absence of a showing that such a rule is necessary to protect vital First

Amendment interests, we decline to deviate from the general rule that one seeking relief bears the burden of demonstrating that he is entitled to it. *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 294 n. 5, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Once plaintiffs show that the government regulation impinges on First Amendment rights, the burden shifts to the government to justify the regulation. *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 816, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000).

## B. Congressional Authority to Legislate for the District of Columbia

 The United States contends that this case may be decided without reaching the difficult constitutional issue of whether the Barr Amendment infringes upon plaintiffs' rights of free speech. The United States argues that the Barr Amendment is a valid exercise of Congress' plenary legislative authority over the District of Columbia and, therefore, implicates no First Amendment interests. This argument must fail. Congress' plenary authority over the District of Columbia does not give it license to legislate in a manner that contravenes First Amendment rights. Once Congress legislates for the District, it is "the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 5 U.S. 137, 1 Cranch 137, 177 [2 L.Ed. 60] (1803). To the extent that Congressional legislation violates First Amendment rights of District residents, the judicial branch is empowered— and obligated—to strike down such legislation.

The United States further argues that the Barr Amendment must be constitutional because it simply reinforces existing federal narcotics law. The Court also rejects this argument. That a Congressional enactment is consistent with existing federal law in no way immunizes the enactment from constitutional challenge.

### 1. Congress' plenary power to legislate for the District

"The District of Columbia is constitutionally distinct from the States." *Palmore v. United States,* 411 U.S. 389, 395, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973). The power of Congress to legislate for the District of Columbia is "plenary." In *Palmore,* the Supreme Court addressed the scope of this power:

Not only may statutes of Congress of otherwise nationwide application be applied to the District of Columbia, but Congress may also exercise all the police and regulatory powers which a state legislature or municipal government would have in legislating for state or local purposes. Congress may exercise within the District all legislative powers that the legislature of a state might exercise within the State, and may vest and distribute the judicial authority in and among courts and magistrates, and regulate judicial proceedings before them, as it may think fit, *so long as it does not contravene any provision of the constitution of the United States.*

*Id.* at 397, 93 S.Ct. 1670 (emphasis added).

The United States suggests that Congress' plenary authority to legislate for the District insulates the Barr Amendment from First Amendment challenge. Yet, the United States fails to recognize that *Palmore* limits Congress' plenary authority to that legislative action within constitutional bounds. In reviewing the authority of Congress to vest judicial power in non-Article III courts for the District of Columbia, the Court considered that the appellant's "trial by a nontenured judge [did not] deprive him of due process of law under the Fifth Amendment." *Id.* at 410, 93 S.Ct. 1670.

Just as this Court may strike down as unconstitutional legislation enacted by Congress for the entire country, the Court is fully empowered to review legislation for the District of Columbia for constitutional infirmities. The United States' suggestion that this Court should ignore the clear constitutional concerns raised by the Barr Amendment in deference to Congress' plenary power to *legislate* is wholly without merit.

Congress has removed certain subjects from the legislative authority of the City Council. For example, Congress has mandated that no buildings higher than ten stories be built in the District, and that no commuter tax be levied. Consequently, the United States argues, these subjects are removed from the ballot initiative process, which the D.C. Court of Appeals has held is coextensive with the Council's authority to legislate. Thus, according to the United States, Congress does not engage in unconstitutional viewpoint discrimination when it opposes the medical use of marijuana any more than when it enacts legislation reflecting policy choices with respect to commuter taxes or height restrictions. U.S.Mem. in Support of Mot. for Sum.Judg. ("U.S.Mem.") at 10.

While presenting an impressive display of logical deduction, the United States cites no authority for the proposition that, should Congress see fit to enact a law barring the expenditure of funds for a ballot initiative on the height of buildings in the District or on a commuter tax, such a law would be constitutional. The United States purports to rely on *Bishop v. District of Columbia*, 401 A.2d 955 (D.C.1979) (en banc). Yet, *Bishop* has little bearing on this Court's review of a subject matter restriction on a ballot initiative process, as it considered whether the City Council had exceeded its statutory authority in enacting a tax law. *Id.* at 957–58.

The United States asks the Court to consider that Congress' constitutional ability to legislate on specific subject matters and to "withdraw" a matter from the legislative sphere is equivalent to a constitutional right to impose viewpoint-based restrictions on the District's ballot initiative process. Essentially, the United States contends that, through the Barr Amendment, Congress has simply legislated prospectively. In other words, that Congress has expressed its opinion about a District law "in advance of an election on a ballot initiative," does not render the Barr Amendment unconstitutional. U.S.Mem. at 14. If the Barr Amendment did not implicate First Amendment rights, the United States might well be correct. However, the First Amendment limits the manner in which Congress may legislate, and the argument that Congress has simply chosen the most efficient means of legislating can not pass constitutional muster if the "prospective" legislation violates individuals' First Amendment rights. Congress' plenary power to legislate for the District of Columbia in no way strips this Article III Court of its authority, and its duty, to consider claims of constitutional violations.

## 2. Conflict with existing federal law

The United States also argues that the Barr Amendment implicates no First Amendment rights because it merely seeks to ensure harmony between the Controlled Substance Act and District law. The United States contends that Congress' opposition to the medical use of marijuana is embodied in federal law, the Controlled Substances Act, 21 U.S.C. § 801, *et seq.* Thus, the government concludes, "[a]s the ultimate legislative authority for the District of Columbia, Congress may refuse to fund a ballot initiative that would be inconsistent with that law." U.S.Mem. at 17.

The government asserts that "[a]n initiative ... may be kept off the ballot if it

would be unconstitutional or contrary to law if enacted." U.S. Proposed Findings of Fact ("USPFF") ¶ 28. However, the cases on which the United States relies stand, at most, for the proposition that in a "truly extreme case" the D.C. Superior Court might find that a proposed measure was not a proper subject for an initiative because it is "patently, obviously, and unquestionably unconstitutional." *Hessey v. Burden*, 615 A.2d 562 (D.C.1992). In *Hessey*, the court cautioned "that the court's jurisdiction should be very sparingly exercised, and that in the great majority of cases the court in its discretion should decline to consider pre-election challenges to the constitutionality or legality of an initiative." In *Committee for Voluntary Prayer v. Wimberly*, the D.C. Court of Appeals again noted that pre-election review of an initiative's constitutionality was proper in very few circumstances, but upheld the trial court's discretionary decision to consider the initiative's constitutionality. 704 A.2d 1199 (D.C.1997) (where ballot initiative clearly violated Establishment Clause). Neither of these cases supports a conclusion that an initiative may be kept off the ballot because it is "contrary to law."

The United States also cites the Home Rule Act as support for its conclusion that the Barr Amendment simply reinforces the condition that ballot initiatives may not conflict with federal law. While the Home Rule Act mandates that a "proper subject" for a ballot initiative not conflict with the District's anti-discrimination laws, this provision can not be expanded to suggest that a ballot initiative is improper if it conflicts with *any* law—federal or otherwise. In fact, a ballot initiative, by definition, must propose legislation, and thus may well be contrary to existing law. *See Price v. District of Columbia Elects. & Ethics*, 615 A.2d 562, 578 (D.C.1992) ("initiative measure must propose a 'law'; it cannot be sustained if it is 'administrative' in nature").

Nothing in the Home Rule Act prohibits the Board from certifying as a "proper subject" an initiative that, if enacted, would conflict with federal law.[2] The authority to enact legislation by ballot initiative, however, is considered to be co-extensive with the City Council's power to legislate. Section 1–602.02 details limitations on the Council's legislative authority, and states that the Council shall not have the authority to "enact any act, or enact any act to amend or repeal any Act of Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District." D.C.Code § 1–206.02(a)(4). The proposed initiative would not "amend" or "repeal" the Controlled Substance Act in the plain meaning of those words.[3] The regulatory scheme

---

**2.** At oral argument, the Board counsel affirmed that the Board is of the opinion that the initiative "would have been a proper subject" of an initiative but for the Barr Amendment. *See* Tr. at 4:21–23, 5:9–11.

**3.** At oral argument, the United State stated that it was *not* arguing that plaintiffs' initiative measure would constitute a repeal of federal legislation on controlled substances. However, in its memorandum in support of its summary judgment motion, the United States predicts that the initiative "would circumvent the Congressionally-established pro-

cess for the reclassification and legalization of Category I substances under the Controlled Substances Act." U.S.Mem. at 13. In *McConnell v. United States*, the D.C. Court of Appeals held that an initiative measure that amended the District's Uniform Controlled Substances Act ("USCA") in a way that conflicted with the federal Narcotic Addicts Rehabilitation Act ("NARA") was an invalid exercise of legislative authority. 537 A.2d 211, 214 (D.C. 1988). The USCA limited treatment for offenders to those without prior convictions, where NARA permitted treatment of offenders with one prior conviction. The D.C. Court of

of the Controlled Substance Act does not preclude the existence of the District's own criminal statutes. An amendment of the District's criminal law would not conflict with the Controlled Substance Act, and would not inhibit enforcement of the Act.

## C. The Barr Amendment Implicates First Amendment Concerns

This Court's inquiry is three-fold. First, the Court must determine whether the speech at issue is protected by the First Amendment, and the nature of that speech. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). If the Barr Amendment implicates protected speech, the Court must determine whether the Amendment restricts speech on the basis of its content or its viewpoint, as the appropriate standard for judicial review will depend on the nature of the restriction on speech. *R.A.V. v. St. Paul*, 505 U.S. 377, 382–383, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). Finally, the Court must assess whether the justifications proffered for the regulation satisfy the requisite standard. 473 U.S. at 797, 105 S.Ct. 3439. The Court must ascertain the type of speech, if any, implicated by the Barr Amendment.

Plaintiffs submit that the Barr Amendment restricts core political speech. The United States, on the other hand, contends that the Barr Amendment does not regulate speech, but rather, merely withdraws a matter from the legislative jurisdiction of the Council and the initiative process. Yet, the United States also argues that

any restriction of plaintiffs' speech is a secondary effect of the Barr Amendment, or is a permissible regulation of "expressive conduct." While the Court considers the United States' arguments that the Barr Amendment's effect on plaintiffs' speech is constitutionally permissible, the Court can not take seriously the assertion that the Barr Amendment has *no* effect on plaintiffs' speech. By operation of the Barr Amendment, plaintiffs are unable to receive Board approval of a petition, which they would circulate for the necessary signatures. Circulation of a Board-approved petition necessarily involves expressive interaction with the public, whether it is limited to a request for signatures or involves an extended debate of the initiative's merits. *See Meyer v. Grant*, 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988).

## 1. The Barr Amendment Restricts Core Political Speech

Supreme Court precedent leaves no doubt that substantial First Amendment rights of speech and association extend to the circulation of ballot initiatives. Here, the effect of the Barr Amendment is to prevent plaintiffs from conducting a petition drive for voter signatures necessary to qualify the initiative for the next general election's ballot. The Barr Amendment also denies plaintiffs the ability to sign a petition to place the initiative on the ballot. Vital First Amendment principles are at stake when the speech restricted involves political expression.

Appeals found that the two statutes were in clear conflict "on their face[s]." Therefore, the amendment to the USCA was void as an ultra vires attempt to repeal federal legislation. The Court is not convinced by the D.C. Court of Appeals' conclusion that the USCA initiative constituted a "repeal" of federal legislation simply because the two laws applied to the same class of offenders potentially eligible for treatment. *Id.* at 214 n. 3. In any

event, *McConnell* is distinguishable from the instant case because the proposed initiative and the Controlled Substance Act are not in clear conflict. Rather, the proposed initiative would affect criminal penalties imposed by the D.C.Code, but would not impact federal narcotics law or its enforcement. Thus, in no way would the initiative "repeal" the Controlled Substance Act.

The Supreme Court has consistently held that the ballot petition process involves speech protected by the First Amendment. In *Meyer v. Grant,* the Supreme Court struck down a state prohibition against paying circulators of ballot initiative petitions. 486 U.S. at 422, 108 S.Ct. 1886. "Petition circulation," the Court held, is "core political speech," because it represents "interactive communication concerning political change." *Id.* The Court described the First Amendment protection for such interaction as being "at its zenith." *Id.; accord Delgado v. Smith,* 861 F.2d 1489, 1494 (11th Cir.1988) ("[a]ny degree of governmental hindrance on the freedom of a given group of citizens to pursue the initiative petition process with whomever, and concerning whatever they choose must be viewed with some suspicion."); *Biddulph v. Mortham,* 89 F.3d 1491, 1500 (11th Cir.1996) ("We obviously would be concerned about the free speech and freedom-of-association rights were a state to enact initiative regulations that were content based or had a disparate impact on certain political viewpoints."); *but see Skrzypczak v. Kauger,* 92 F.3d 1050, 1053 (10th Cir.1996) ("nothing in *Meyer* suggest[s] that there is a protected right to have a particular initiative on the ballot").

In *Buckley v. American Constitutional Law Foundation,* the Supreme Court again underscored the constitutional protections afforded to political expression by ballot petition circulators. 525 U.S. 182, 192, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999). In *Buckley,* nonprofit organizations who regularly participated in Colorado's referendum petition process challenged a state statute as unconstitutional where the statute required circulators to be registered voters and to wear identification badges, and required proponents of initiatives to report the names and addresses of all paid circulators and the amount that they were paid.[4] *Id.* at 186–87, 119 S.Ct. 636. The Court held that all three provisions violated the First Amendment's guarantee of free speech. *Id.*

*Buckley* echoed *Meyer's* holding that the speech of the petition circulators constituted core political speech. "[P]etition circulation is the less fleeting encounter, for the circulator must endeavor to persuade electors to sign the petition. [This] endeavor ... 'of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change.'" 525 U.S. at 199, 119 S.Ct. 636 (citing 486 U.S. at 421, 108 S.Ct. 1886); *see also id.* at 211, 119 S.Ct. 636 (Thomas, J., concurring) ("The aim of a petition is to secure political change, and the First Amendment ... guards against the State's efforts to restrict free discussion about matters of public concern."). *Buckley* exhorts courts to be "vigilant" to "guard against undue hindrances to political conversations and the exchange of ideas." *Id.* at 192, 119 S.Ct. 636.

The United States contends that no speech, and certainly no political expression, is restrained by the Barr Amendment. This argument strains credibility. The United States apparently suggests that, because the Barr Amendment leaves plaintiffs free to circulate petitions, issue press releases and petition Congress, it does not regulate speech. Such reasoning is simply contrary to Supreme Court precedent. Neither *Buckley* nor *Meyer* queried whether other avenues for expressing political ideas were available where it was clear that the plaintiffs sought to express their views through the ballot initiative

---

4. The Court considered the regulations at issue in *Buckley* to impose "severe burdens" on speech and required that they therefore be

"narrowly tailored to serve a compelling state interest." 525 U.S. at 642, 119 S.Ct. 936. *See infra* Part II.F. (applying strict scrutiny).

process. Here, plaintiffs are prohibited from circulating a petition to have their initiative placed on the ballot. That some First Amendment activities are unaffected by the Barr Amendment in no way supports the proposition that other First Amendment rights are not impinged.

The United States relies on a Tenth Circuit decision preceding *Buckley* to suggest that plaintiffs have no First Amendment right to have a specific initiative included on the ballot. *Skrzypczak v. Kauger*, 92 F.3d 1050, 1053 (10th Cir.1996). The Tenth Circuit rejected a First Amendment challenge to an Oklahoma Supreme Court decision that refused to permit a proposed ballot initiative to be placed on the ballot when the initiative would have resulted in an unconstitutional law prohibiting abortion. *Id.* at 1052. While the Tenth Circuit asserts that the plaintiff has no legally cognizable "right to have a particular proposition on the ballot," the court cites no authority for this conclusion. *Id.* at 1053. In any event, the case is inapposite because the plaintiff claimed a right to vote on the initiative, but claimed no speech interest in circulating a petition. *Id.* (distinguishing *Meyer*). In light of *Buckley*, there can be no doubt that the speech of ballot petition circulators is political expression protected by the First Amendment. 525 U.S. at 199, 119 S.Ct. 636.

The United States' second line of reasoning is no more persuasive. It argues that the First Amendment is not implicated by the Barr Amendment because the Barr Amendment does not restrict plaintiffs' right to vote.[5] The United States relies on a body of case law that recognizes that the right to a state initiative process is not guaranteed by the United States Constitution and, consequently, is not entitled to the same protection as is the right to vote.[6] Yet, plaintiffs do not claim that the ballot initiative process, *per se*, is constitutionally mandated; rather, they assert constitutional rights to engage in political expression free of discriminatory governmental regulation.

The Barr Amendment effectively prohibits plaintiffs from circulating a Board-approved petition for signatures in an attempt to submit an initiative for placement on the ballot at the next general election. There can be no doubt that the Barr Amendment restricts plaintiffs' First Amendment right to engage in political speech.

### 2. The United States' Arguments to the Contrary are Not Persuasive

The United States would characterize the Barr Amendment as regulating only conduct, thus implicating a more lenient standard of review for governmental re-

---

**5.** The United States distinguishes the instant case from *Turner*, which *did* implicate the right to vote. The Supreme Court has consistently held that the right to vote is a fundamental right, *see, e.g., Kramer v. Union Free School Dist.*, 395 U.S. 621, 626, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); *Reynolds v. Sims*, 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). *Turner* suggested that the version of the Barr Amendment in effect at the time might unconstitutionally infringe on plaintiffs' right to vote.

**6.** *See, e.g., Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir.1997); *Taxpayers United for Assessment Cuts*, 994 F.2d 291, 296 (6th Cir.1993) (finding no precedent holding that "signing a petition to initiate legislation is entitled to the same protection as exercising the right to vote"); *Kelly v. Macon–Bibb County Bd. of Elections*, 608 F.Supp. 1036, 1038 (M.D.Ga.1985) (where plaintiffs brought constitutional challenge to requirement that petitions be signed by registered voters who voted in the last general election, court held that no fundamental constitutional right implicated because referendums are not "constitutionally compelled").

strictions of expressive conduct. In the alternative, the United States relies on precedent involving state regulation of election procedures and government-sponsored speech to argue that the Barr Amendment should not be subject to strict judicial scrutiny.

### a. The Barr Amendment does not regulate expressive conduct

While advocating that the Court review the Barr Amendment pursuant to the *O'Brien* test [7] for expressive conduct, the United States offers no explanation of why this test should apply. The United States asserts that the Barr Amendment is targeted at preventing a change in the city's law, and is not directed at limiting speech. Yet, the United States wholly fails to identify conduct on the part of plaintiffs—expressive or otherwise—that would be affected by the Barr Amendment. Presumably, the circulation of petitions could be construed as expressive conduct. However, the Barr Amendment, to the extent that it regulates plaintiffs' conduct, restricts conduct integral to plaintiffs' speech, and is not properly analyzed under the *O'Brien* test. *United States v. O'Brien*, 391 U.S. 367, 382, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (distinguishing case from one where the "alleged governmental interest in regulating conduct arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful").

Moreover, even if the Court were inclined to construe the Barr Amendment as implicating expressive conduct, and not speech, the Court would be obliged to ap-

ply strict scrutiny in reviewing the Amendment. The Supreme Court has "long held, ... that nonverbal expressive activity can be banned because of the action it entails, but not because of the ideas it expresses...." *R.A.V.*, 505 U.S. at 385, 112 S.Ct. 2538 (explaining that "burning a flag in violation of an ordinance against outdoor fires could be punishable, whereas burning a flag in violation of an ordinance against dishonoring the flag is not"). Any expressive conduct targeted by the Barr Amendment is targeted *because of* its viewpoint-specific message—advocacy for a decrease in penalties for particular types of marijuana use.

### b. The Barr Amendment is not a regulation of election procedures

The United States relies on a line of cases describing valid, content-neutral regulations of the electoral process to contend that the Barr Amendment should be subject to a relaxed standard of review. These cases balance the significant state interest in protecting the "integrity and reliability" of the initiative and electoral processes, *Buckley*, 525 U.S. at 191, 119 S.Ct. 636, against the "character and magnitude of the asserted injury" to First Amendment speech and associational rights. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 368–70, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (upholding "antifusion" law that prohibits candidates' names from appearing as the candidate of more than one party on the ballot); *accord Burdick v. Takushi*, 504 U.S. 428, 441, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (upholding law banning write-in voting on ballots). How-

---

**7.** The *O'Brien* test validates governmental regulation of expressive conduct when the regulation:

is sufficiently justified if it is within the constitutional power of the Government; ... furthers an important or substantial governmental interest; if the government

interest is unrelated to the suppression of free expression; and if the incidental restriction on the alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.
*United States v. O'Brien*, 391 U.S. 367, 377–77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

ever, such a balancing test is inappropriate in this case.

The United States has not argued that the Barr Amendment is aimed at furthering Congress' interest in maintaining order in the democratic processes of the District, or at regulating the process by which District laws are enacted. The competing regulatory interests recognized by cases such as *Burdick* and *Timmons* are inapplicable to the Court's analysis of the constitutionality of the Barr Amendment.[8]

### c. The Barr Amendment does not regulate government-sponsored speech

In refuting plaintiffs' charge that the Barr Amendment discriminates on the basis of viewpoint, the United States argues that such viewpoint-based discrimination is permissible when Congress appropriates money for the District's legislative process. U.S.Mem. at 12–13.

The United States relies on *Rust v. Sullivan* for the proposition that "viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker or uses private speakers to transmit information about government programs." 500 U.S. 173, 193, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). Thus, the United States posits that Congress, to the extent that it finances the District's legislative process, may " 'take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee[s]' of that authority and those funds." U.S. Reply Mem. at 13 (quoting *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001)).

Yet, plaintiffs' speech is neither government speech nor government-funded speech. The United States offers no explanation for why this Court should view the democratic, legislative processes of the District as Congressional programs, or the plaintiffs as grantees of Congressional funds. *Cf. Buckley*, 525 U.S. at 193, n. 11, 119 S.Ct. 636 (noting that, "[a]lthough circulators are subject to state regulation . . ., circulators act on behalf of themselves or the proponents of ballot initiatives[,]" and not as agents of the state).

In *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001) the Court held that once Congress had funded the legal aid organizations and their speech, it could not then restrict legal aid attorneys from advocating for a change or unconstitutionality of welfare laws. 531 U.S. at 547–48, 121 S.Ct. 1043; *accord Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (noting that an "as-applied" challenge to a denial of a grant could be maintained where the denial was the "product of invidious viewpoint discrimination").

■ The ballot initiative process is designed to facilitate broad public participation in enacting legislation for the District. Where government funds are expended "to encourage a diversity of views from private speakers," and the speech in question is not government speech or government-subsidized speech, the government may not discriminate on the basis of viewpoint. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515

---

8. Even if the Court were to find that the Barr Amendment acts as a content-neutral regulation of the petition process, the Amendment would likely be subject to strict judicial scrutiny. Where a regulation of electoral procedures imposes a severe burden on speech or association, the regulation must be narrowly tailored to serve a compelling interest. *Bur-*

*dick*, 504 U.S. at 434, 112 S.Ct. 2059. The Barr Amendment clearly poses a burden on speech more severe than that in *Buckley*, where petition circulators were required to wear identification badges. 525 U.S. at 199, 119 S.Ct. 636 (finding badge requirement to be more severe than regulation banning anonymous handbills).

U.S. 819, 834, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). That the ballot initiative process is funded by federal monies simply does not transform all speech that occurs in the context of the initiative process into government-subsidized speech.

### D. The Barr Amendment is Viewpoint Discriminatory

█ The First Amendment generally prohibits the government from proscribing speech "because of disapproval of the ideas expressed." *R.A.V.*, 505 U.S. at 382, 112 S.Ct. 2538 (internal citations omitted). Regulations affecting protected speech may be generally classified in three ways: (1) regulations restricting speech on account of the message expressed (viewpoint-based), *see id.;* (2) regulations of speech on a certain subject-matter or of a particular category (content-based), *see Hill v. Colorado*, 530 U.S. 703, 723, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2001); or (3) regulations based on criteria other than the content of the restricted speech, *see Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

█ In its briefs, the United States contends that the Barr Amendment is a content-neutral regulation of speech, if it regulates speech at all. Thus, the United States asserts that the Court need only ask if the Barr Amendment is a reasonable restriction on the time, place and manner of plaintiffs' speech. *See Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). However, a content-neutral regulation is one "justified without reference to the content of the regulated speech." *Clark*, 468 U.S. at 293, 104 S.Ct. 3065. The Barr Amendment explicitly refers to the subject-matter of the speech it restricts.

The Barr Amendment regulates speech about penalties for marijuana use. As such, it is content-based. *Buckley*, 525 U.S. at 209, 119 S.Ct. 636 (Thomas, J., concurring) (advocating that the requirement that petition circulators disclose their names and the amount that they were paid was content-based regulation). However, the Barr Amendment does more than "directly regulate[ ] the content of speech." [9] *Id.*

The Barr Amendment proscribes specific viewpoints. Viewpoint-based regulations are those that prohibit specific messages, but not others. *R.A.V.*, 505 U.S. at 391, 112 S.Ct. 2538; *see id.* at 392, 112 S.Ct. 2538 (The city "has no . . . authority to license one side of a debate to fight freestyle, while requiring the other to fol-

---

9. The United States also attempts to argue that the Barr Amendment constitutes a valid content-based restriction on the proper subject-matter of a ballot initiative. Suggesting that subject-matter restrictions on ballot initiatives are routinely enforced by courts, the United States relies on several inapposite cases that collectively stand for the proposition that an initiative process may be limited to a range of proper subject matters by enacting legislation or by a statutory scheme. *See Dorsey v. District of Columbia Bd. of Elections & Ethics*, 648 A.2d 675 (D.C.1994) (ballot initiative called for appropriating funds); *Foster v. Clark*, 309 Or. 464, 790 P.2d 1, 7 (1990) (where state constitution requires that ballot initiatives propose municipal legislation and court found that proposed initiative proposed administrative, and not legislative, action, the petition was not a proper subject for the ballot); *Sinawski v. Cuevas*, 133 Misc.2d 72, 76–77, 506 N.Y.S.2d 396 (N.Y.Sup.Ct.), aff'd, 123 A.D.2d 548, 506 N.Y.S.2d 711 (N.Y.App.Div. 1986) (finding that, without express grant of substantive right of recall by direct vote of electorate, court would not expand scope of law permitting initiatives and local laws on selection and removal of officers and that initiative was therefore not a proper subject for an amendment to the city charter).

low Marquis of Queensberry rules."). In *Good News Club v. Milford Central School,* the Court held that a resolution refusing to permit a club to use a school's facilities "for the purpose of conducting religious instruction and Bible study" constituted viewpoint discrimination. 533 U.S. 98, 104, 107, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001). In the instant case, the challenged legislation prohibits plaintiffs from circulating a petition that would *reduce* penalties for marijuana use, while permitting the Board to approve a ballot petition calling for *increased* penalties for marijuana use. As counsel for the United States ultimately conceded at oral argument, the Barr Amendment is—on its face—viewpoint-based. *See* Tr. at 73:11–13, 86:23–87:7.

Having conceded that the Barr Amendment was viewpoint-based legislation, the United States argued that all legislation is viewpoint-based in some way, and that the Barr Amendment merely expresses a policy decision about the type of legislation the District should adopt. *Id.* at 73:14–15. Yet, that the Barr Amendment seeks to limit speech, which might result in a legislative enactment, in no way insulates the Barr Amendment from constitutional review. Rather, in *First National Bank of Boston,* the Court noted that the regulation in question did not prohibit a corporation from expending corporate funds to express its views on public issues *unless* those issues became the subject of a referendum. 435 U.S. at 793, 98 S.Ct. 1407. Such a limited scope of the regulation did not shield the regulation from First Amendment scrutiny, but rather was cause for suspicion that the legislature may have been concerned with silencing corporations on a particular subject. *Id.* In the instant case, suspicion gives way to reality. Congress clearly intends that the District's citizens not have the opportunity to express views on a particular subject matter, and has silenced a specific viewpoint advo-

cated by plaintiffs. The unavoidable conclusion is that the Barr Amendment is viewpoint-discriminatory and is subject to the strictest scrutiny.

### 1. Secondary effects doctrine does not apply

The United States argues that any impact that the Barr Amendment may have on speech is merely a "secondary effect" of legislation aimed at regulating specific conduct and, therefore, is constitutionally permissible. Specifically, the United States contends that the Barr Amendment "is directed at the 'secondary effects' of increased drug use and supply in the District of Columbia." *See* USPFF ¶ 67.

The secondary effects doctrine may represent a "valid basis for according differential treatment to even a content-defined subclass of proscribable speech." *R.A.V.,* 505 U.S. at 389, 112 S.Ct. 2538. However, the regulation must be "justified without reference to the content of the ... speech." *Id.* (citing *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)). For example, in *Boos v. Barry,* the Court explained that "the desire to suppress crime has nothing to do with the actual films being shown inside adult move theaters, [and the Court] concluded that the regulation was properly analyzed as content neutral." 485 U.S. 312, 320, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (discussing *Renton* ).

Where a regulation is concerned with the "direct impact of a particular category of speech," such a regulation would necessarily be content-based, and "not a secondary feature that happens to be associated with that type of speech." *Boos,* 485 U.S. at 321, 108 S.Ct. 1157; *id.* at 335, 96 S.Ct. 1551 (Brennan, J., concurring) ("The *Renton* analysis ... creates a possible avenue for governmental censorship whenever censors can concoct 'secondary' rationaliza-

tions for regulating the content of political speech.").

The United States suggests that, had the Barr Amendment attempted to regulate the "primary effects of expression," it would be targeted at the "effect on voters of reading the ballot initiative;" rather, the Amendment is directed at impacts on public health and safety. Yet, the clear intent of the Barr Amendment—evident on its face—is to prevent the District of Columbia from expending money on the process of enacting or carrying out any law legalizing or otherwise reducing penalties associated with possession, use or distribution of schedule I substances. The Amendment directly regulates the legislative enactment process. It regulates the two avenues for passing legislation in the District: the ballot initiative and the City Council.[10] If Congress was motivated by a desire to regulate marijuana use, it has obvious and accessible direct means of enacting such legislation. Instead, the Barr Amendment seeks to remedy the potential "effects" of the political speech and the legislative process, in which plaintiffs seek to engage— i.e. the possibility that the District residents will hear plaintiffs' speech in support of the initiative and sign a Board-approved petition, resulting in the placing of the initiative on the ballot. The purpose of prohibiting the enactment of legislation legalizing marijuana is thus integrally tied to the content of plaintiff's expression, and the infringement on plaintiffs' speech is not a "secondary effect" of the Barr Amendment.

### E. Limited Public Forum

Plaintiffs urge this Court to find that the ballot initiative process is a limited public forum that has been opened to political discourse through the Home Rule Act. *See*

*Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (if a school had, by policy or practice, opened its mail system for use it might create a "limited" public forum, to which entities of similar character would have a constitutional right of access). Because the Court finds that the Barr Amendment is a viewpoint discriminatory regulation that implicates plaintiffs' core political speech and is thus subject to strict scrutiny, the Court need not decide whether the ballot initiative process is a limited public forum.

Nevertheless, Supreme Court precedent on limited public forums confirms the notion that Congressional legislation must not contravene First Amendment protections. That Congress has created the ballot initiative process—and may take it away—is not license for unconstitutional regulation. In *Legal Services Corp. v. Velazquez,* the Court held that, although Congress had itself created the Legal Services Corporation, it could not constitutionally create a forum for the legal aid attorneys to speak and then regulate the attorneys' speech on the basis of content. 531 U.S. at 547–48, 121 S.Ct. 1043. Similarly, the Court has held that a university, by accommodating meetings of student groups, created:

> [a] forum generally open for use by [the] groups. Having done so, the University has assumed an obligation to justify its discriminations and exclusions under applicable constitutional norms. The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place.

---

**10.** The Court need not reach the persuasive argument that the Barr Amendment's legislative history demonstrates that the Amendment was primarily aimed at restricting access to the ballot initiative process, and less concerned with action by the City Council.

*Widmar v. Vincent,* 454 U.S. 263, 267–68, 102 S.Ct. 269, 273, 70 L.Ed.2d 440 (1981). The ballot initiative process clearly opens a forum to political expression, albeit limited by the Home Rule Act. The Barr Amendment discriminates on the basis of viewpoint within this arena for speech. As such, it is subject to exacting judicial scrutiny, whether or not the ballot initiative process is characterized as a "limited public forum."

The United States suggests that, should the Court find that the ballot initiative process is a limited public forum, "the District Board of Elections would be *required* to allow any and all subjects to become ballot initiatives regardless of whether or not they ultimately could become law." USPFF ¶ 77. Such a result, contends the United States, would be contrary to law: "not only does the ballot initiative *not* have to be open to all viewpoints—legally it cannot." ¶ 78. Although the government cites to *Committee For Voluntary Prayer,* 704 A.2d 1199 (D.C. 1997) and *Bishop,* 401 A.2d 955 (D.C.1979), neither of these cases nor any other authority support such a conclusion.[11] As discussed earlier, ballot initiatives necessarily propose legislation, and many may advocate changes in existing law. Therefore, while not deciding the question of whether the ballot initiative process is properly analyzed as a limited public forum, the Court wholly rejects the United States' underlying argument that the process is "limited" by existing law.

### F. The Barr Amendment Can Not Survive Strict Scrutiny

When the government discriminates on the basis of viewpoint, such regulation is presumed to be constitutionally infirm and is subjected to the strictest judicial scrutiny. *R.A.V.,* 505 U.S. at 382, 112 S.Ct. 2538. In *Good News Club,* the Court held that, where it had found that a "restriction [was] viewpoint discriminatory, [it] need not decide whether it is unreasonable in light of the purposes served by the forum." 533 U.S. at 107, 121 S.Ct. 2093. Even where the government asserts a compelling interest in a regulation, it is unclear what interest would be sufficient to justify viewpoint discrimination. *Id.* at 2103 (finding that "it is not clear whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination"); *cf. Boos,* 485 U.S. at 321, 108 S.Ct. 1157 ("[f]or the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.").

In *Buckley* and *Meyer,* content-neutral restrictions on core political speech failed to survive strict scrutiny. *Buckley* counseled that content-neutral restrictions on the speech of petition circulators "significantly inhibit[s] communication with voters about proposed political change" and must be "narrowly tailored to serve compelling governmental interests." *Buckley,* 525 U.S. at 192, 192 n. 12, 119 S.Ct. 636 (discussing *Meyer*).

The United States fails to demonstrate that the Barr Amendment is narrowly tailored to achieve a compelling government interest. The United States claims that the Barr Amendment is justified by the government's interest in ensuring that federal law on marijuana use are upheld and

---

11. As discussed in Part II.B. of this Memorandum Opinion, *Committee for Voluntary Prayer* stands for the proposition that D.C. Superior Court *may,* in "extreme" cases, determine that it is appropriate to review the constitutionality of a proposed ballot initiative prior to permitting citizens to vote on the initiative, 704 A.2d at 1202, while *Bishop* found that a City Council measure was improper because it constituted a commuter tax forbidden by the Home Rule Act, 401 A.2d at 957–58.

in preventing individuals from using marijuana. USPFF ¶ 61 (government has "substantial interest in preventing the illegal distribution, cultivation, and possession of marijuana and other Schedule I drugs prohibited by the Controlled Substances Act").

While recognizing that the federal government's interest in enforcing the Controlled Substances Act may constitute a compelling interest, the Court finds that the viewpoint discriminatory effect of the Barr Amendment is nonetheless unconstitutional. In *Good News Club*, the Supreme Court rejected the argument that a state law provision could justify viewpoint discrimination: "Because we hold that the exclusion of the Club on the basis of its religious perspective constitutes unconstitutional viewpoint discrimination, it is no defense for Milford that purely religious purposes can be excluded under state law." 533 U.S. at 107, n. 2, 121 S.Ct. 2093.

Furthermore, even if the Court were to apply traditional strict scrutiny to the Barr Amendment—a standard of review more appropriate for a content-based, viewpoint-neutral restriction on speech—it is unlikely that the United States could demonstrate that the Barr Amendment is narrowly tailored to achieving the governmental interest in compliance with federal narcotics law. Strict scrutiny requires that government regulation be no more restrictive of First Amendment rights than necessary to achieve the asserted government interest. *Buckley*, 525 U.S. at 192, 119 S.Ct. 636; *cf. Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (for content-neutral regulation, government need not choose the most effective means).

The United States asserts in a conclusory fashion that "prohibiting the District from enacting or implementing a law that would legalize or reduce the penalties for the possession, use, or distribution of a

Schedule I substance ... is narrowly tailored to meet the government's interest in controlling drug-related crime and abuse." USPFF ¶ 64. The Court, however, can not concur. Congress has the constitutional authority to directly legislate for the District of Columbia; thus, pursuant to the extraordinary powers given to Congress by the Constitution, Congress may enact a substantive law that prohibits any changes in the District's law regulating marijuana use. Congress also possesses the power to veto any legislative act passed by the City Council or by the citizens of the District. In place of directly legislating for the District, or vetoing measures adopted by the citizens or City Council, Congress chose to burden individuals' right to political expression in its attempt to achieve its objective. Such a weighty imposition on the First Amendment rights of plaintiffs simply cannot withstand strict scrutiny.

## CONCLUSION

For the foregoing reasons, the plaintiffs' motion for summary judgment is **GRANTED** and the defendant's motion for summary judgment is **DENIED**. Constitutional precedent of long-standing persuades the Court that the Barr Amendment regulates core political speech on the basis of the viewpoint expressed and is unconstitutional as applied to plaintiffs. Accordingly, enforcement of the Barr Amendment with respect to plaintiffs' proposed ballot initiative is permanently enjoined by the Court.

An appropriate Order accompanies this Memorandum Opinion.

## ORDER AND JUDGMENT

Pursuant to Federal Rule of Civil Procedure 58 and for the reasons stated by the Court in its Memorandum Opinion docketed this same day, it is hereby

**ORDERED** that plaintiffs' motion for summary judgment is hereby **GRANTED;** and it is

**FURTHER ORDERED** that defendant United States' motion for summary judgment is hereby **DENIED;** and it is

**FURTHER ORDERED** and **AD-JUDGED** that the Clerk shall enter final judgment in favor of plaintiffs and against defendant, which judgment shall declare that Section 127 of the District of Columbia Appropriations Act, 2002, Pub.L. 107–96, § 127, 115 Stat. 923 (2001) ("Barr Amendment"), is unconstitutional; and it is

**FURTHER ORDERED** that defendant District of Columbia Board of Elections and Ethics is hereby permanently **RE-STRAINED, ENJOINED** and **PROHIB-ITED** from refusing to take action on plaintiffs' "Medical Marijuana Initiative of 2002" on the grounds that any such action might violate the Barr Amendment.